**In re Estate of Rose M. Eiswert**

LOVECCHIO, *J.*, June 3, 2014—Rose M. Eiswert passed away on April 26, 1995. Fred C. Eiswert, her son, was appointed as executor of her estate on May 16, 1995.

On April 9, 2013, Fred Eiswert, as executor, filed a first and final account and statement of proposed final distribution of the estate. On May 6, 2013, Robert J. Miller as executor of the Estate of Alice I. Miller, daughter of the deceased, filed objections to the first and final account. On September 13, 2012, Fred Eiswert as executor, filed an answer to the objections.

A status conference was held before the court on December 10, 2013. Following said conference, an order was entered addressing discovery and scheduling issues. Pursuant to that order dated December 10, 2013, on March 14, 2014, the parties filed a joint stipulation of issues and

facts. Said joint stipulation of issues and facts withdrew varied objections and identified objections "remaining in dispute." A hearing on the objections was held on March 19, 2014. Following said hearing, the court directed that the parties informally provide case citations. As well, objectant was given until March 28, 2014 to file his post hearing proposed findings of fact and conclusions of law. The executor was given until April 11, 2014 to file any responsive document.

The record is now closed, the respective proposed findings and conclusions have been filed and the case is ripe for a decision.

Fred Eiswert was first called as a witness on behalf of the objectant. The first issue discussed was the delay between his appointment as executor and the filing of the final accounting and proposed distribution.

During his direct testimony as well as when he was recalled on his own behalf, he referenced various reasons for the delay. He noted that the land was being farmed and was still productive. He referenced a condemnation matter in which Penn DOT condemned 13 acres to build a new road, resulting in extensive litigation. He referenced the fact that given the price of land and interest rates as well as third party interest in purchasing separate lots, it made sense to try to sell off some lots especially when the price of a lot could be close to the price for the entire parcel. He referenced that he tried to settle the estate but once it became clear that his brother-in-law through his niece wanted to purchase the parcel for far less than what it was worth, things became very difficult. He indicated that there was a complete lack of cooperation and that the matter appeared to be headed to court.

Mary Lewis also testified. Her mother Alice passed away in 2007. Her father Robert is the executor of her mother's estate but because of dementia and other health issues, she has been acting on his behalf through a power of attorney. She did not rebut the testimony of Mr. Eiswert. Rather she indicated that she was interested in purchasing the property at either a private or public sale. She then wanted to resell the property at a premium.

On behalf of her mother's estate, she did not agree with the remaining siblings who wanted to either hold the property jointly or to buy out her mother's interests. She indicated that prior to pursuing her objections, there was no contact or correspondence between the parties for a period of five to six years. She indicated as well that her side of the family did not get along with the others. She also indicated that her side of the family was losing out because of the "future income on the property." She did not believe the property could be held jointly because it "hadn't worked out previously." There was "no relationship" between the parties.

Her proposal was to purchase the property in her and/or her husband's names. She was willing to pay more for the property. Accordingly, each of the siblings would receive greater monies than if the property were held and eventually sold. She did not wish to keep the property under any circumstances. She intended on purchasing the property and then selling it to a third party at a greater price than for what it was purchased. Documentation was produced at the hearing and entered under separate exhibits. The documentation included letters between counsel on behalf of their respective parties.

The court will address each of the objections separately

or group-wise depending upon their nature. The court will also reference the relevant testimony with respect to the objection(s) at issue.

Objections 2, 3, 4, 5 and 7 allege that the executor failed to fulfill his duty to collect, marshal, inventory and distribute the assets of the estate in a reasonable and timely manner and that a surcharge is warranted. The administration of the estate took 18 years to complete and objectant contends that this delay prevented him from possessing and enjoying the real estate, from being able to invest liquid monies he was entitled to, and from receiving benefits from the distribution. Objectant also contends that by the unwarranted delay, the executor used the land for personal and financial gain.

The court cannot conclude that the delay in the administration of the estate was a violation of the executor's duty to the estate under the circumstances.

An executor is "required to use such common skill, prudence and caution as a prudent man, under similar circumstances, would exercise in connection with the management of his own estate." *Estate of Lohm*, 269 A.2d 451, 454 (Pa. 1970).

Contrary to the position of the objectant, the court finds that the reasons for the delay were both reasonable and necessary and in fact worked to the beneficiaries' benefit. At all times, the executor exercised prudence, skill and caution in the exercise of his duties.

The dispute between the objectant's family and the remaining families was such that an expeditious resolution was impossible. This is confirmed by the fact that despite years of attempts, the parties have been unable to reach

an agreement. Complicating the matters were the Penn DOT litigation, the roller coaster real estate values, the roller coaster interest rates, the health of the sister and then her husband, the fact that the siblings wanted to keep the property and the fact that the objectant wanted to sell the property, the fact that the property was being farmed and producing income, the fact that the property had significant sentimental value and the fact that there is no evidence whatsoever to prove that a loss has been caused to the objectant by the executor.

Rose Eiswert died in 1995. 30 acres were sold in 1996 and then Alice Miller died in 2007. Robert Miller never talked about maintaining the property. He wanted it to be sold immediately but at the time the value was extremely low. Indeed, by not selling the property, its value substantially increased. The oil and gas rights became an unexpected valuable asset, resulting in a substantial increase in the value of the property.

The first time that the executor became aware that the objectant was pursuing legal action related to a gas lease was approximately five to six years ago.

Of further note, the objectant failed to take action on his own behalf to expedite the finalization of the estate. He failed to move for the filing of a final accounting or failed to file any pleading to dispose of the disputed property. He failed to take any action to compel the conclusion of the estate. The only action that he took was once the accounting was filed.

By letter dated January 29, 2010, objectant's counsel was provided with a copy of the first and partial accounting. A few weeks later, objectant's counsel responded that the copy was received and requested an estate appraisal.

Approximately a year later, objectant's counsel notified the executor's counsel that the accounting was reviewed and that they would like "additional information" and an opportunity to discuss the matters further. A full year later, an attempt was made to transfer the property from the estate to all of the siblings. This effort was on behalf of the estate. A few months after that, apparently because the matters stalled, the executor and remaining siblings offered to purchase the objectant's one-fifth interest. Approximately a month later, estate counsel again sought a response.

It became clear in July of 2012 that the objectant did not wish to accept the offer instead contending that the appraised value demanded more. Furthermore, the issue was referenced regarding the Oil and Gas Lease.

The negotiations continued through early 2013 without the parties being able to come to a resolution.

Also complicating the matters was a Pennsylvania Department of Public Welfare lien on objectant's estate in the amount of over $300,000.00.

As the executor properly notes in his proposed findings, there is no per se rule in the Commonwealth that the length of time of estate administration automatically results in a surcharge. *Estate of Getz*, 618 A.2d 456 (Pa. Super. 1992). Because objectant is seeking a surcharge, he bears the burden of proving the executor's wrongdoing. *Estate of Harrison*, 745 A.2d 676 (Pa. Super. 2000).

Objectant has not met that burden. Given the many varied circumstances, the court finds that the executor's actions in administering the estate for the many years was reasonable in all respects. Accordingly, a surcharge will

not be imposed.

Objectant next asserts that the attorney's fees of $32,197.54 incurred by the executor are unreasonable and excessive and would not have been incurred had the executor properly fulfilled his fiduciary duties in a reasonable and timely manner. Objectant's proof with respect to this claim, however, is lacking. But for the bald assertion that the fees were unreasonable and not necessary in light of the alleged delay, there was no proof whatsoever in support of the objection.

In evaluating a claim contesting legal fees, the court must determine the reasonableness of said fees. *Estate of Getz*, 618 A.2d at 462. The court must look at many different factors including but not limited to the amount of work performed, the character of the services rendered, the difficulty of problems, and the value and amount of property in question, *Getz, Id.* at 462. Objectant has again failed to meet his burden. Even if so, the evidence presented by the executor establishes the reasonableness of the attorney fees.

In fact, the executor testified that in his opinion and experience, the fees were reasonable. The attorneys provided legal services in connection with numerous aspects of the estate administration as well as the litigation that arose out of the filing of objections and attempts to resolve the differences between the parties. The attorneys were involved in the sales of the separate parcels, the Penn DOT litigation and the major dispute relating to the disposition of the Dauber Road, Cogan Station property.

Further, the testimony supports the conclusion that the vast majority of the fees were incurred by the estate as a result of the dispute regarding the property and in

an attempt to either resolve the dispute or successfully litigate the matter on behalf of the estate. The court finds that the attorney's fees were reasonably related to the estate administration and estate litigation.

Objectant next asserts that the "fiduciary fees" paid to the executor in the amount of $2,000.00 were unreasonable given the executor's alleged failure to fulfill his fiduciary duties. Again, the court cannot agree. Objectant's evidence in support of this claim is lacking. The objectant has failed to prove that the executor fees paid were unreasonable. *Wallis Estate*, 218 A.2d 732 (Pa. 1966).

The fiduciary fee of $2,000.00 was extremely reasonable in light of the services that the executor provided to and on behalf of the estate. The Will was probated, an inventory was filed, tax returns were filed, there were partial distributions to beneficiaries, litigation was pursued against Penn DOT, the property was partially parceled off and lots were sold, negotiations took place in connection with the Dauber Road property, the executor participated in discovery and actively participated in the litigation.

Moreover, and perhaps determinatively, but for the efforts of the executor, the estate would have been valued at far less than its final value. For example, the Penn DOT litigation in and of itself resulted in an increase in the estate assets of approximately $32,000.00. Executor's exhibit E. The executor continued receiving farming monies for the estate and eventually obtained CREP payments totaling $56,000.00. The estate was maintained to such an extent that the present appraisal value is $336,000.00, far in excess of what it was appraised of as of the date of death.

Objectant next argues that the executor improperly

paid himself $510.00 for "expenses" related to the maintenance and upkeep of the property, improperly paid Lee Eiswert $2,646.36 for similar services to the estate and improperly paid Robert Eiswert $3,591.00 for similar services provided to the estate.

Other than confirming that the amounts were paid, that approval for the services was not obtained from all of the beneficiaries, and that Lee, and Robert Eiswert were paid $1.00 over minimum wage and reimbursed for expenses, no further evidence was provided by objectant in support of his claim.

The executor credibly testified that the monies were paid for necessary services including cleaning out of culverts, maintenance work, cutting of brush, maintaining roads, generally maintaining the fields and doing "preventative work." He testified that the work was in fact performed and that payment was made for the hours expended plus expenses. The hourly rate was $1.00 above the minimum wage. He further testified that if other individuals had been hired to perform the work, the estate would have paid much more. He also testified that the work was previously performed by all three individuals while the decedent was living.

Again, the objections fail. The executor fulfilled his statutory duty to preserve the estate. 20 Pa. C.S. § 3311. There is no proof that the monies expended were unreasonable or not necessary. In fact, the expenses for the estate were both reasonable and necessary. Indeed, the court finds credible the testimony of the executor that had the services been contracted out to others, the estate would have paid much more.

Finally, the argument that the monies that were paid

were not necessary because the estate should have been resolved in a more timely manner, is rejected by the court. As previously noted, under all of the circumstances, the estate was administered in as timely and reasonable manner as possible.

Objectant also argues that the executor improperly rented the farm between 1996 and 2001. Objectant claims that the rent should not have been reduced between 1997 and 1998 and thereafter, that the lease was unlawful and that the renting of the land prevented the land from being enrolled in the "CRP Program."

The executor testified that the lease "with the farmer who farmed the land" was an oral lease. The lease had previously been entered into between his parents and the farmer. Prior to his mother's death, it was farmed by the same individual for 10 or 12 years. According to his mother, the man's "word was good." The property was farmed by the farmer until 2005 when the farmer passed away.

Following the farmer's death, the executor found out about the CREP program. He did not apply to the CREP program prior to that time because he "didn't know about it" and the farm was continuing to be farmed. No one ever advised him of the CREP program and no one ever objected to the continued farming.

The objections to the farming income fail. No proof has been provided in support of them. The court finds that the executor's conduct with respect to farming the property was not only consistent with his mother's wishes and practice but also in the best interest of the beneficiaries. Moreover, the executor cannot be surcharged for choosing to have the property farmed versus enrolling it in the CREP

program. He was not advised of it by anyone let alone any beneficiary and cannot be held to have constructive knowledge of it through any other source.

Objectant next argues that the sale of Lot No's. 3, 4, and 5 for the respective prices of $19,789.00, $19,299.00, and $19,500.00 was improper in that they were not sold for a fair market value. Objectant claims that the executor should be surcharged for the difference between the amount received and the fair market value. Curiously, however, objectant provided no evidence whatsoever as to the fair market value of the lots at the time they were sold. The credible testimony from the executor supports the conclusion that the sale of the lots was both reasonable and in the best interest of the estate and ultimate beneficiaries.

In arriving at a price per lot, the executor "checked to see what lots were going for." He spoke with a real estate agent who indicated to him that the prices were "too high" and that the lots "would never sell for that price." The lots were sold to disinterested third parties. The executor had no relationship whatsoever with the purchasers prior to the transactions. Except for a "small break" on a bulk sale of two lots, no concessions were made on the purchase price.

Moreover, in selling the lots, the executor received a premium price that supported a decision to keep the remaining property in the hope that its value would not only increase but that it could be subdivided and sold by separate parcels. In fact, it appears to the court that this was not only a reasonable course of action but the most desirable course of action. The property that had been in the family for years could be kept, lots could be sold for a high price and then the monies could be used to maintain

the remaining property and to provide a greater return to the beneficiaries.

The objections with respect to the three lots at issue are clearly without merit. The executor acted reasonably and entirely within his statutory authority. 20 Pa. C.S. § 3351. He acted with prudence and caution. The court further finds that his judgment was not in error. Conversely, it was in the best interest of the estate.

Objectant next argues that the Penn DOT settlement was not reasonable and that the executor should be surcharged for the difference between the amount received and what would be considered a reasonable settlement. Again, however, objectant has not provided any evidence whatsoever as to what "would be considered a reasonable settlement." In fact, the evidence was clearly in favor of the executor.

The land at issue was condemned by Penn DOT while the deceased was living. Litigation was commenced seeking a reasonable price for the condemned property. A board of view was convened and following the board of view, it was determined that a reasonable price for the condemned property was as set forth in its findings. An allegation that the board of view's finding was not reasonable is specious without any other proof whatsoever. In fact, the process is specifically designed to produce a reasonable result.

Objectant's claim is even more frivolous in light of the fact that not only did the estate receive a substantial amount of money for the value of the property at issue but also received a substantial check for interest income on the settlement. (Executor's exhibit A, schedule G, p. 20).

The executor's actions with respect to the Penn

Dot condemnation were reasonable under all of the circumstances and in the best interests of the estate. Objectant has failed to prove any entitlement whatsoever to a surcharge.

Objectant next argues that the CREP payments in 2006 through 2012 somehow should result in the executor being surcharged for failing to distribute the real estate. Objectant argues that the surcharge should be based off of the annual rent payments from CREP that could have been earned had the executor timely enrolled the land in the program. This issue has been previously addressed in this opinion. The court finds nothing improper in the executor's failure to enroll the property in the CREP program prior to 2006. The continued farming of the property was consistent with the decedent's practice and wishes and in the best interest of the estate and beneficiaries.

Objectant also argues that the executor should be surcharged $355.56 which was paid by the estate as interest due on 2007 and 2008 tax returns. Objectant argues that the taxes were not done correctly and, accordingly, the executor should be surcharged this amount.

An executor is not an insurer of the estate. The executor is not held to an exacting standard. An executor is held to a reasonable standard. The executor in this case did not violate that standard.

As the executor credibly testified, he hired "a professional" to prepare the taxes. This professional made a mistake and the mistake was discovered and appropriately corrected. The error on the accountant's part cannot be attributed to the executor.

In connection with the taxes, the objectant also argues

that the executor should be surcharged for approximately $19,000.00 in federal income tax due as the executor allegedly failed to finalize the estate and distribute the assets in a timely manner. Objectant further argues that the 1041 should have distributed the income to the beneficiaries for the beneficiaries to report on their individual income tax, which would provide a more favorable tax consequence to the estate and beneficiaries.

The alleged untimeliness of finalizing the estate has been addressed previously and objectant's claim is rejected. With respect to the remaining argument regarding "favorable tax consequences" the objectant failed to produce any testimony whatsoever in support of his claim. Objectant failed to meet his burden of proof in contending that the beneficiaries bore a higher tax burden because the income was paid by the estate. Accordingly, such claim will also be rejected.

The final issue to be addressed by the court and as identified by the parties relates to the disposition of the Dauber Road, Cogan Station real estate. As the court noted in its December 10, 2013 Order, the executor and three of the beneficiaries want to buy the remaining beneficiary's interest. While the court noted in said order that the remaining beneficiary, Estate of Alice Miller, desired to purchase the property from the others, the testimony produced at the hearing in this matter demonstrated otherwise.

More specifically, Mary Lewis, daughter of Alice Miller, deceased, wishes to purchase the property and intends on purchasing the property "at any sale." Her intentions were made crystal clear. She wants to purchase the property as a whole and to then sell the property later to make more money. She claims that by purchasing the property at a

premium, she will increase the financial value of the estate for each beneficiary including her mother's estate. On the other hand, the executor and remaining beneficiaries are desirous of keeping the property and buying out the remaining beneficiary's interest. They assert that the property has been in the family for many years and should stay in the family. They also argue that by keeping the property its value will only increase and they will continue to get proceeds from the Oil and Gas Lease. They also argue that keeping the property is consistent with their mother's intent.

All of the parties agree that the property cannot be held jointly. Previously, the relationship between the parties substantially deteriorated. There is no communication between the parties except through attorneys and clearly this litigation and the substantial sums of money expended in litigating the dispute between the parties has further entrenched them in their animosity toward each other. The parties have agreed that this court can direct the disposition of the property.

The fair market value of the real estate at issue is $336,000.00 for the entire estate, including oil and gas rights. In deciding how to distribute this property, the court will consider several factors.

The first factor relates to the history of the property and the intent of the testator. The property has been in the family for decades. It clearly has sentimental value to the living children of the decedent. Unfortunately, Alice Miller passed in 2007, 12 years after her mother died. Her husband Robert Miller, contrary to the surviving children, wanted the property to be sold immediately. His health, however, deteriorated and now his daughter, Mary Lewis, has

become the decision maker. Her connection to the property is even more remote. She has nowhere near the emotional connection as do the surviving children to Rose Eiswert.

The court will next consider the motivations of the respective parties. The motivation of the estate and beneficiaries is to keep the majority of the property as one parcel for the benefit and use of the remaining siblings, to hopefully increase the value of the property over time with perhaps a premium being made through oil and gas production, and to potentially pass on a much more valuable asset to their surviving heirs. The motivations of Mary Lewis are solely financial.

Her stated motivation, while at first glance appearing to be legitimate, also perhaps veils another motivation. Specifically, by her buying the property in her own name, she essentially double-dips in connection with her father's estate. She gets the property, a very valuable asset and can sell it with the entire surplus going to her. When her father dies, his assets will be distributed equally amongst his beneficiaries, who are Mary Lewis and her siblings. Alternatively, if the property remains with her mother's estate, whatever value, will be distributed equally between her and her siblings once her father dies. Moreover, if her mother's share is brought out, she will again be limited to her proportionate share of her father's estate. Clearly, Ms. Lewis will benefit more financially through her request to buy the property in her name.

The court will next consider the best interests of the respective beneficiaries. At this time, each beneficiary possesses a value in the property of approximately $67,000.00 if the property would be sold at its present market value of $336,000.00. The estate of Alice Miller

has no interest in the property except financial. Her estate would benefit most by a timely distribution to her of as much monies as possible, not wanting to risk any ebb and flow with respect to the real estate market and/or oil and gas production. There is no benefit to her estate with respect to the actual property or the use and enjoyment of it. On the other hand, the remaining living beneficiaries have a direct benefit in the use and enjoyment of the property. Furthermore, they have a direct benefit in the potential upside of the property value increasing and/or increased oil and gas production. Moreover, they have expressed a willingness to accept any risks associated with the ebb and flow of the market and production. Clearly, the best interests of the beneficiaries points to the property being held jointly.

Under all of the circumstances, while the estate could have been resolved earlier, the court does not find any merit to the objections filed by the Estate of Alice Miller. It is clear to the court that prior to Alice Miller's death, there was no dispute between the parties and the siblings had been working together expecting that they would each end up with their one-fifth respective shares.

Upon Alice's death, however, things dramatically changed. The issue became one solely of financial gain. The estate of Alice Miller, as to be expected, wanted the value of her inheritance. The remaining beneficiaries wanted to maintain the status quo. The parties could not agree and substantial litigation ensued.

The numerous and varied objections filed by the estate seem to be nothing more than a veiled attempt to pressure the estate into negotiating the sale of the property, or at the very least to compel a partition of the property. There was

little if any proof in support of the objections. Assertions were made without much if any evidentiary support.

The court finds that the executor performed his duties in a reasonable and necessary manner under all of the circumstances and has not committed any malfeasance whatsoever in connection with his responsibilities to the estate and ultimately to the beneficiaries. Accordingly, the following order will be entered:

## ORDER

And now, this 3rd day of June 2014, following a hearing and consideration of the respective briefs filed by the parties, the court denies the objections of the Estate of Alice Miller to the first and final account of Fred C. Eiswert, executor. The proposed statement of distribution is affirmed except that the Dauber Road, Cogan Station, Lycoming Township property known as Lycoming County Tax Parcel No. 27-288-0115 shall be distributed in kind as tenants in common to the beneficiaries Fred Eiswert, Grace Letterman, Lee Eiswert and Robert Eiswert. The estate of Rose Eiswert shall pay $67,200.00 to the Estate of Alice I. Miller in exchange for Alice I. Miller's proportionate share of the property.